# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| PHOENIX RESTORATION GROUP, INC. and AVSMOOT, LLC, | |
| Plaintiffs, | Civil Action No. 18-2121 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| LIBERTY MUTUAL GROUP INC. d/b/a LIBERTY MUTUAL INSURANCE and OHIO SECURITY INSURANCE COMPANY, | |
| Defendants. | |

## MEMORANDUM OPINION

The parties have, since October 2018, jointly pressed for trial, bypassing any pretrial motion practice, to resolve their insurance dispute concerning coverage pertaining to a devastating fire that occurred at the plaintiffs' place of business in July 2016 and alleged misrepresentations made by the defendants' agents concerning that coverage. *See* Rep. Parties' Planning Mtg. ¶ 4(k) (Oct. 29, 2018) (recommending date for final pretrial conference in July 2019), ECF No. 7; Joint Status Rep. at 1 (July 8, 2019) (requesting that "trial date be promptly scheduled"), ECF No. 13; Pls.' Consent Mot. for Final Pretrial Conf. at 1 (Oct. 21, 2019), ECF No. 16 (same); Pls.' 2nd Consent Mot. for Final Pretrial Conf. at 2 (Dec. 5, 2019), ECF No. 18 (same).[1] Now, at the eleventh hour, with the trial scheduled to begin on March 9, 2020, the parties have changed their tune. Pending before the Court is the defendants' motion, filed one week *after* the trial date was set, seeking dismissal, with prejudice, of "Counts Two and Three of

---

[1] This case was reassigned to the undersigned on January 9, 2020, *see* Reassignment Civ. Case, ECF No. 20, and, after a status conference held the next day, a scheduling order was entered setting the date for the jury trial to begin on March 9, 2020, *see* Scheduling Order (Jan. 10, 2020) (setting dates for motions *in limine*, joint pretrial statement, pretrial conference, and trial).

1

the Complaint" "in accordance with Rule 12(b)(6) and Rule 12(c) of the Federal Rules of Civil Procedure." Defs.' Mem. P. & A. ("Defs.' Mot.") at 6, ECF No. 23.[2] Additionally, the parties now insist that aspects of the plaintiffs' breach-of-contract claim in Count One of the Complaint turn solely on interpretation of certain provisions in the two insurance policies that the parties agree are unambiguous, such that disagreements over interpretation are to be resolved by the Court, not the jury. *See* Pls.' Statement on Issues Requested by Court's Jan. 10, 2020 Order ("Pls.' Statement") at 8, 9, 10, 11 (arguing that the "Court can rule, as a matter of law/summary judgment"), ECF No. 24; Joint Statement on Issues Requested by Court's Jan. 17, 2020 Order ("Joint Statement") at 3, 5, 7, 8 (conveying the defendants' agreement that certain provisions are unambiguous and that the issues of interpretation are "for the Court and not for a jury," *id.* at 3), ECF No. 25.

Given that this case is hurtling toward trial, the pending issues belatedly identified by the parties as appropriate for the Court rather than the jury to decide require resolution at a fire drill pace to avoid frustrating or wasting the time of the jury that will be convened to resolve the parties' factual disputes. *See* FED. R. CIV. P. 1 ("[These rules] should be construed, administered, and employed by the court . . . to secure the just, speedy, and inexpensive determination of every action and proceeding."). For the reasons explained below, the defendants' motion for judgment on the pleadings is denied, and the unambiguous meaning of certain provisions in the insurance

---

[2] This motion was made in response to the Court's order directing the defendants to advise whether the defendants waived their Answer's first defense, which asserted the plaintiffs' claims in Counts Two and Three of the Complaint failed to state a claim upon which relief may be granted. *See* Min. Order (Jan. 10, 2020); Answer at 1 (First Defense), ECF No. 1-2. Although the defendants frame their pending motion as made pursuant to both Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 12(b)(c), *see* Defs.' Mot. at 6, a 12(b)(6) motion "must be made before pleading," FED. R. CIV. P. 12(b), and the defendants' Answer was filed over sixteen months ago, in September 2018, prior to the defendants' removal of this action to this Court. Consequently, the defendants' motion is construed as solely seeking judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* FED. R. CIV. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c) . . . .").

2

policies is explicated to guide the jury in determining whether and how much the plaintiffs remained owed on their outstanding insurance claims.

I.  **BACKGROUND**

The plaintiffs Phoenix Restoration Group, Inc. ("Phoenix") and AVSmoot, LLC, two restoration subcontractors providing "restoration work, including the refinishing of historic doors, windows, and architectural woodwork," Compl. ¶ 7, ECF No. 1-1, performed much of their work at 3150 Bladensburg Road NE, Washington, DC 20018, *id.* ¶ 8, where a fire "causing substantial damages" occurred on July 13, 2016, *id.* ¶ 9. Prior to the fire, each plaintiff had purchased commercial insurance through defendant Liberty Mutual Group Inc. *Id.* ¶ 8; *see* Phoenix Policy, ECF No. 26-1; AVSmoot Policy, ECF No. 26-2. Defendant Ohio Security Insurance Company served as the underwriter. Compl. ¶ 8.

The July 2016 fire was an "occurrence" under the plaintiffs' policies. *Id.* ¶ 10. Accordingly, the plaintiffs submitted claims to the defendants, and while the defendants made some payments, the plaintiffs believe they are owed more. *See, e.g.*, *id.* ¶¶ 17, 20, 27.[3] Additionally, the plaintiffs allege that the defendants' agents made misrepresentations regarding how the plaintiffs' claims would be treated, upon which representations the plaintiffs reasonably relied to their detriment. *See id.* ¶¶ 12–19. The Complaint sets out three claims for relief: in Count I, for breach of contract due to the defendants' "refus[al] to pay . . . substantial insurance proceeds appropriately owed . . . in material breach of the terms of" the insurance policies, *id.* ¶¶ 23–28; in Count II, for promissory estoppel based on the plaintiffs' reliance on the explanations and promises made by the defendants' agents about, *e.g.*, "the manner in which certain types of

---

[3]  The defendants indicate that payments have been made, between July 19, 2016 and November 28, 2017, in the total amount of $915,048.00 for all of the plaintiffs' "substantiated claims" under the insurance policies, Defs.' Resp. to Show Cause Min. Order ("Defs.' Resp.") at 8, ECF No. 29, and the plaintiffs' contend that the defendants still owe $1,779,514.48 to fulfill their policy obligations, and that, with interest, attorneys' fees, costs, and treble damages, the total damages, as of December 13, 2019, amount to $6,188,543.44, *see* Ex., Pls.' Revised Rule 26 Initial Disclosures, ECF No. 19-1.

fire losses would be categorized . . . as Extra Expenses (which had no cap), rather than Business Personal Property (which had a cap)," *id.* ¶¶ 30, 32; and in Count III, for violation of the District of Columbia's Consumer Protection Procedures Act ("DC-CPPA"), D.C. Code § 28-3901, *et seq.*, premised, again, on the alleged misrepresentations made by the defendants' agents, Compl., ¶¶ 35–39.

## II. DISCUSSION

The defendants' motion for judgment on the pleadings is addressed first, followed by the meaning of policy provisions that the parties agree are unambiguous.

### A. The Defendants' Motion for Judgment on the Pleadings

The defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(b)(c) with respect to Count II and Count III for failure to state a claim upon which relief can be granted. Defs.' Mot. at 6. The gravamen of this motion is that the plaintiffs' allegations about reliance on the defendants' claims representatives' statements concerning treatment of the plaintiffs' claims under the insurance policies, which alleged representations turned out to be contrary to how the defendants ultimately categorized the losses, are insufficient to support the plaintiffs' claims for promissory estoppel and for violation of the DC-CPPA. *Id.* at 1, 3. The defendants are wrong.[4]

#### 1. *Standard of Review*

A motion for judgment on the pleadings for failure to state a claim is "functionally equivalent to a Rule 12(b)(6) motion," and thus the same legal standard applies. *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012). To survive a failure-to-state-a-claim challenge, a "complaint must contain sufficient factual matter, accepted as true, to state a claim

---

[4] Since the defendants' motion for judgment on the pleadings as to Counts II and III is denied on the merits, the plaintiffs' alternative argument that this motion should be summarily denied as untimely because of the prejudice to the plaintiffs at this late date shortly before trial, need not be addressed. *See* Pls.' Opp'n at 7–9.

to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). In deciding whether a complaint fails to state a claim, the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also, e.g.*, *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1265 (D.C. Cir. 2019).

### 2. *The Defendants are Not Entitled to Judgment on Count II*

As noted, the plaintiffs' Count II for promissory estoppel is predicated on allegations that the defendants' agents provided guidance that, *inter alia*, certain insured losses would generate proceeds that would be treated as Extra Expenses, but instead "those loss proceeds were categorized as paid on Business Personal Property," Compl. ¶ 32, to the plaintiffs' detriment. The defendants contend that the plaintiffs have failed to state a claim because "the doctrine of estoppel cannot be used to alter or amend an insurance contract. Neither waiver nor estoppel can be used to extend the coverage or scope of an insurance policy." Defs.' Reply to Pls.' Opp'n to Defs.' Mot. ("Defs.' Reply") at 2 (citing *Walker v. Am. Ice Co.*, 254 F. Supp. 736 (D.D.C. 1966) and *Diamond Serv. Co. v. Utica Mut. Ins. Co.*, 476 A.2d 648 (D.C. 1984)), ECF No. 28; Defs.' Mot. at 2 (same). The plaintiffs counter that their promissory estoppel allegations are not accusing the defendants' claims representatives of amending the insurance policies, "but rather, that Liberty's employees and agents *interpreted* [the policies'] existing terms, and then represented that interpretation to the Plaintiffs." Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n") at 3 (emphasis in original), ECF No. 27.

5

The plaintiffs are correct that under District of Columbia law, an insured may assert a claim of estoppel based on an insured's representations about how an insurance policy will be interpreted, but only when the relevant terms of the insurance policy are ambiguous. *See Moore v. Blue Cross & Blue Shield of Nat'l Capital Area*, 70 F. Supp. 2d 9, 32 (D.D.C. 1999) (finding medical insurance company estopped from denying coverage when beneficiaries relied on misleading representation by insurance agent about scope of coverage); *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1205–07 (D.C. 1999) (noting that "if the policy were ambiguous, then the objective reasonable expectations of [the insured] should guide an interpretation of the insurance contract" (quoting *W. Exterminating Co. v. Hartford Accident & Indem. Co.*, 479 A.2d 872, 877 (D.C. 1984)); *see also* 28 AM. JUR. 2d *Effect of or on Contract* § 54 (2d ed. 2020) ("[P]romissory estoppel is not available when an unambiguous contract exists that covers the issue for which damages are sought."). Thus, to evaluate the parties' dispute over the viability of the plaintiffs' claim for promissory estoppel, the specific alleged misrepresentations must be identified and the associated policy provision covering those misrepresentations reviewed for any ambiguity.

The defendants' motion paints too broad a brush by simply relying on the fact of a contract between the parties to seek dismissal of the promissory estoppel claim. To prevail under their theory, the defendants must point to the specific contract provision, or lack thereof, that unambiguously addresses, or is silent about, the subject of the alleged misrepresentation, which must be assumed to be true for purposes of this motion. *See Wood*, 572 U.S. at 757–58. The defendants, however, have not done so. Further, the defendants must explain how that contract provision clearly delineates that the loss proceeds at issue were properly categorized as paid on Business Personal Property. Again, the defendants have not done so. Absent sufficient explanation of how an insurance provision (or provisions, or lack thereof) applies

unambiguously to the relevant context, the defendants' motion falls far short of providing a persuasive basis, particularly at this late date on the eve of trial, for dismissal of Count II.[5]

Accordingly, the defendants' motion for judgment on the pleadings as to Count II is denied.

### 3. *The Defendants are Not Entitled to Judgment on Count III*

As to Count III, which alleges that the defendants' misrepresentations about their insurance policies violated the DC-CPPA, defendants argue that the plaintiffs have failed to "set forth facts that meet the plausibility standard that [any] agent, employee or representative of the Defendants misrepresented a material fact, which has a tendency to mislead, or failed to state a material fact intended to mislead the Plaintiffs." Defs.' Mot. at ¶ 12. Yet, even a cursory read of the Complaint reveals that the plaintiffs have alleged detailed facts in support of Count III, claiming, *e.g.*, that "Liberty's retained accountant" made representations to the plaintiffs during an "August 31, 2016 meeting" about how "[c]ertain losses (such as hiring ServPro to perform clean-up services)" would be categorized, Compl. ¶ 14, and that "[d]efendants thereafter treated several of the losses differently than had been promised," *id.* ¶ 16. The defendants then, the plaintiffs claim, "revealed to Plaintiffs" these "improper reallocations" only after "many months had passed," *id*. ¶ 18, and the plaintiffs cite, as an example, the defendants' October 25, 2016

---

[5] The plaintiffs describe other alleged misrepresentations by the defendants' claims representatives in response to the Court's order directing the parties to identify the specific policy provisions at issue. *See* Joint Statement at 12–13. Specifically, the plaintiffs contend that "Liberty's various misrepresentations of coverage induced Plaintiffs not to submit certain additional claim amounts," including (1) "wrongfully applying a BPP limit . . . for both its own and others' property [which] induced Phoenix to dispose of approximately $139,030 worth of its own damaged BPP in the warehouse . . . [when] Liberty should and could have paid for the damaged BPP (without regard to any policy limit), or to transport, store, and repair the salvageable BPP," *id.* at 12; (2) "wrongly telling . . . Phoenix that Plaintiffs could not claim lost net profits and continuing expenses during the period of restoration when in fact this is exactly what the Policy provides," which "induced Plaintiffs . . . to forego a traditional BI claim submission [and] miss[] the opportunity to submit $150,000 in additional BI loss amounts," *id*; and (3) "misrepresent[ing] the nature and limit of the one-year of extended business interruption ("EBI") coverage. . . [which] induced Plaintiffs to refrain from an EBI submission at all missing out on *12 months* of EBI coverage," *id.* at 12–13 (emphasis in original). These alleged misrepresentations are not directly recounted in Count II—though may be alluded to in other parts of the Complaint and incorporated by reference, *see* Compl. ¶ 29—but, again, for purposes of the defendants' pending motion for judgment on the pleadings, the defendants have not shown that policy provisions unambiguously cover these alleged misrepresentations.

schedule of certain claims categorized as "Extra Expense," which were, in a subsequent April 26, 2017 schedule, re-categorized as Business Personal Property, "thereby subjecting those losses to that category's caps," *id*. Further, according to the plaintiffs, the defendants also allegedly "asserted restrictions found nowhere in their own insurance policies." *Id*. ¶ 20.

As the D.C. Court of Appeals has explained, "[t]he CPPA is a 'comprehensive statute designed to provide procedures and remedies for a broad range of practices which injure consumers,'" *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) (quoting *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003)), that, as "a remedial statute . . . must be 'construed and applied liberally to promote its purpose,'" *id*. (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 244–45 (D.C. 2011) (en banc) (quoting D.C. Code § 28-3901 (c))). The defendants have not claimed that they are not "merchants" within the meaning of the DC-CPPA, which applies to a company that "in the ordinary course of business does or would sell . . . consumer goods or services." D.C. Code § 28-3901(a)(3).[6]

In the face of their insurance contracts with the plaintiffs, however, the defendants contend, in reply, that the plaintiffs' claims "might support a claim for breach of contract, but not support a cause of action for a violation of the [DC-CPPA]," because otherwise "every breach of contact [sic] case could be converted into a [DC-CPPA] case." Defs.' Reply at 7. To the extent that the defendants appear to suggest that a viable breach of contract claim obviates the availability of a claim under the DC-CPPA, they are wrong. The DC-CPPA provides broad enforcement mechanisms against unlawful trade practices, which encompasses conduct also subject to contract obligations. Specifically, a "trade practice" is defined to mean "any act which does or would create, alter, repair, furnish, make available, provide information about, or,

---

[6] The DC-CPPA defines "merchant" to mean "a person, whether organized or operating for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice." DC. Code § 28-3901(3)(a).

8

directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services," D.C. Code § 28-3901(a)(6), and contains no exception for acts that are subject to contractual terms. *See, e.g., Crescent Bank & Tr. v. Jones-Bey*, Nos. 18-CV-280, 18-CV-776, 2019 WL 6907829 (Table), at *2–3 (D.C. Oct. 11, 2019) (affirming verdict for plaintiff, who claimed affirmative misrepresentation under DC-CPPA about scope of car insurance coverage, despite insurer's contention that the plain terms of policy said otherwise); *Dist. Cablevision*, 828 A.2d at 723 n.10 (noting that DC-CPPA applies to "a cable television service contract and any provision for liquidated damages that such a contract might contain").

The defendants' motion for judgment on the pleadings as to Count III is therefore denied.

**B.     Issues of Contract Interpretation**

Given that this case, in significant part, is about whether the defendants complied fully with their payment obligations under the terms of the operative insurance policies, the parties were directed to identify and explain prior to trial any dispute over the meaning of any policy provision. *See* 1st Min. Order (Jan. 10, 2020) (directing the plaintiffs to explain whether certain issues "arising from the insurance policies . . . are most appropriate for the Court or the Jury to resolve"); Min. Order (Jan. 17, 2020) (directing the parties jointly to identify insurance policy provisions at issue and, *inter alia*, "each party's view as to whether each provision at issue is unambiguous and, if not, a full explanation as to why the provision is ambiguous"); Min. Order (Jan. 28, 2020) (directing the defendants to explain "why the plaintiffs' construction of the insurance policies . . . should not be adopted by the Court"). In their joint submission, the parties explained that "this case turns largely on factual claim adjustment issues," Joint Statement at 2, and enumerated four issues of contract construction, *id*. at 2–8. Those issues are addressed below, following review of the applicable legal principles.

9

### *1. Applicable Legal Principles*

Under District of Columbia law, "[c]ontract principles are applicable to the interpretation of an insurance policy." *Carlyle Inv. Mgmt. LLC v. Ace Am. Ins. Co.*, 131 A.3d 886, 894 (D.C. 2016). "The proper interpretation" of an insurance contract, "including whether [the] contract is ambiguous, is a legal question." *Id.* (internal quotation mark omitted) (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)). "[A]n insurance policy is to be . . . enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Redmond*, 728 A.2d at 1205 (internal quotation marks omitted) (quoting *Peerless Ins. Co. v. Gonzalez*, 697 A.2d 680, 682 (Conn. 1997)). A court must "give the words used in an insurance contract their common, ordinary, and . . . popular meaning," *Id.* (omission in original) (internal quotation marks omitted) (quoting *Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994)), and must interpret the contract "as a whole, giving reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made," *Carlyle Inv. Mgmt.*, 131 A.3d at 895 (internal quotation mark omitted) (quoting *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009)). Policy language is ambiguous "if, on its face, it has more than one reasonable interpretation." *May v. Continental Cas. Co.*, 936 A.2d 747, 751 (D.C. 2007).

"[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder." *Carlyle Inv. Mgmt.*, 131 A.3d 886 at 895 (internal quotation marks omitted) (quoting *Debnam*, 976 A.2d at 197–98). "Where," however, "insurance contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Fogg v. Fidelity Nat. Title Ins. Co.*, 89 A.3d 510, 514 (D.C. 2014) (internal quotation marks omitted) (quoting *Stevens v. United Gen. Title Ins. Co.*, 801 A.3d 61, 66 (D.C. 2002)).

## 2. Interpretive Issues

The parties identify four issues that turn on interpretation of the insurance policies: (1) whether compensation paid to the plaintiffs' salaried employees for fire recovery work is recoverable as Business Income under the Phoenix Policy, Joint Statement at 7; (2) whether the Phoenix Policy's Business Income provision, which defines Business Income to include "payroll," permits the defendants to impose a 15% cap on the plaintiffs' employee fringe benefit costs, *id.* at 4; (3) whether costs incurred to restore customer goods damaged by the fire are recoverable under the Business Personal Property ("BPP") and/or "Property Damage [to] Customers' Goods" coverage found in the Phoenix insurance policy, *id.* at 6; and (4) whether the insurance policies require that the defendants make advance payments to the plaintiffs, *id.* at 2. These issues are addressed *seriatim*.

### (a) Fire Recovery Work Performed by Salaried Employees

The plaintiffs contend that the Business Income provision in the Phoenix policy, which requires that the defendants reimburse "the actual loss of Business Income . . . sustain[ed] [by Phoenix] due to the necessary 'suspension' of . . . 'operations' during the 'period of restoration,'" Phoenix Policy at 120, covers compensation paid to salaried employees for time spent on fire recovery. The plaintiffs' interpretation is the correct one, and the defendants are "in accord that the provisions of the policies regarding payments for salaried employees are not ambiguous." Joint Statement at 8 (conveying the defendants' position). "Business Income" is defined as: "a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and b. [c]ontinuing normal operating expenses incurred, *including payroll*." Phoenix Policy at 120 (emphasis added). Further, "[t]he amount of Business Income loss [is] determined based on," *inter alia*, "[t]he operating expenses, including payroll expenses, *necessary to resume 'operations' with the same quality of service that existed just before the*

11

*direct physical loss or damage*." *Id.* at 125 (emphasis added). Fire recovery work was necessary to enable the plaintiffs to resume their operations, and thus is an "operating expense" that qualifies as Business Income.

A critical factual dispute, however, remains. Business Income insurance requires an insurer to reimburse Business Income that was *lost*. Sometimes, a business is able to continue its work during a period of restoration and earns enough revenue to cover its normal operating expenses. When this occurs, the insurance company has no obligation to pay for the insured's normal operating expenses. Otherwise, Business Income insurance would provide the insured a windfall, which is not its purpose. *See Verrill Farms, LLC v. Farm Family Cas. Ins. Co.*, 18 N.E.3d 1125, 1129 (Mass. App. Ct. 2014) (explaining that Business Income insurance "is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred—no more" (internal quotation mark omitted) (quoting *Gordon Chem. Co. v. Aetna Cas. & Sur. Co.*, 266 N.E.2d 653, 656 (Mass. 1971)). Here, the defendants contend that the plaintiffs were able to continue their work and have not provided sufficient documentation to establish that any loss of Business Income occurred. *See* Defs.' Resp. at 13. Thus, this factual dispute turns on what the plaintiffs provided to the defendants (and perhaps, when they provided it) to support their claim under the Phoenix policy.

Accordingly, while the relevant policy language is unambiguous, the factual question of whether the plaintiffs have actually lost Business Income must be presented to the jury.

### (b) Cap on Fringe Benefit Costs

The plaintiffs argue that the defendants improperly imposed a 15% cap on the employee fringe benefit cost that the plaintiffs may recover pursuant to the Phoenix policy's Business Income coverage, which, as noted, is defined to include "payroll." The defendants point to no

12

language in the policy that allows for a cap on payroll expenses, fringe or otherwise, instead indicating that "the 15% 'cap' was a formula to measure and identify the percentage of payroll that represented the fringe benefits according to proper accounting methods." Joint Statement at 5; Defs.' Resp. at 9–10. At the same time, both parties agree that this language is unambiguous, and thus the defendants correctly indicate that "this is not a factual dispute but a matter of the construction and interpretation of the insurance policies at issue." Joint Statement at 5.

The plaintiffs are right that the Business Income coverage in the Phoenix Policy does not permit the imposition of a cap on the plaintiffs' fringe benefit costs. The plaintiffs' ability to recover such costs, however, is subject, as noted above, to the plaintiffs demonstrating that they have suffered Business Income *loss*, which is a question for the jury.

### (c) Property Damage to Customers' Goods

The plaintiffs maintain that costs incurred to restore customer goods damaged by the fire are recoverable under two separate provisions of the Phoenix Policy: the BPP coverage, and the "Property Damage [to] Customers' Goods" coverage.

As to the BPP coverage, the defendants agree that these costs are recoverable as BPP and that the BPP provisions are unambiguous, but they argue that a $546,820.32 sublimit applies to all of the plaintiffs' BPP claims and that the plaintiffs have already hit this sublimit, such that the defendants do not have an obligation to pay an additional $26,582 of costs that the plaintiffs have incurred above that sublimit. *See* Joint Statement at 5–6. The plaintiffs counter that the sublimit the defendants point to applies only to the "personal property *of others*" damaged while in the plaintiffs' possession, Phoenix Policy at 26 (emphasis added), and that once the plaintiffs' *own* BPP costs are removed, the plaintiffs' BPP costs subject to the sublimit, including the $26,582 they say they remain owed, are less than the $546,820.32 sublimit, in which case the defendants are obligated to reimburse the remaining $26,582; *see* Joint Statement at 4–5. Bolstering their

interpretation of the policy, the plaintiffs point out that the BPP sublimit found in the AVSmoot policy, *unlike* the BPP sublimit found in the Phoenix Policy, expressly states that it applies to "*Your* Business Personal Property *and* Personal Property of Others." AVSmoot Policy at 22 (emphases added).

The defendants have no response to these arguments, focusing instead on an argument the plaintiffs once raised during the claims adjustment process, but have not made the focus of their current briefing, namely: that these costs to restore customer goods damaged by the fire should have been classified not as BPP but as "Extra Expense," which unlike BPP, is not subject to any sublimit. *See* Defs.' Resp. at 11. That argument is rendered irrelevant, because the plaintiffs are correct that they have not reached the BPP sublimit. If the Phoenix policy's BPP sublimit applied to Phoenix's own BPP costs, the Phoenix policy would have said so, as does the AVSmoot policy. Rather, the Phoenix Policy's BPP sublimit applies only to the costs for personal property "of others." Phoenix Policy at 26. The defendants do not dispute that the plaintiffs' losses pertaining to BPP of *others* fall under the $546,820.32 sublimit. *See* Joint Statement at 7 (stating that no factual dispute exists and that this issue "is for the Court to decide based upon the interpretation of the unambiguous terms and conditions of the policies"). Thus the plaintiffs appear entitled, at a minimum, to recover the $26,582 they remain owed for costs incurred to restore customer goods damaged by the fire.

The plaintiffs also argue, in the alternative, that an additional provision in the Phoenix Policy, the "Property Damage [to] Customers' Goods" provision, covers the $26,582 they have not been paid for the costs they incurred to restore customer goods damaged by the fire. As the provision's name indicates, the "Property Damage [to] Customers' Goods" coverage is available to recover costs for damage to "Customers' Goods." Phoenix Policy at 97. The plaintiffs argue that their customer property damaged in the fire qualifies as "Customers' Goods," because that

14

term is defined to include "property of [Phoenix's] customer[s] on [Phoenix's] premises for the purpose of being worked on or used in [Phoenix's] manufacturing process." *Id.*; *see* Joint Statement at 6. The defendants appear to agree with this assessment. *See* Defs.' Resp. at 11 ("The parties are in accord that the applicable policy provisions are unambiguous.").

Given the parties' agreement, the "Property Damage [to] Customers' Goods" provision unambiguously applies to customer goods that were damaged by the fire, separate from and in addition to the coverage for "Business Personal Property of Others." For this additional reason, the plaintiffs appear entitled, at a minimum, to recover the $26,582 they remain owed for costs incurred to restore customer goods damaged by the fire.

### (d)  Advance Payments

The plaintiffs argue that the insurance policies require that the defendants make partial payments in advance "for any amount that the insurer has determined is covered," even while the defendants are still determining the full amount owed to the plaintiffs. Pls.' Statement at 6. The defendants agree with this interpretation. Defs.' Resp. at 8 ("[D]efendants have advanced numerous payments to the plaintiffs in accordance with the policies . . . "). Thus, the parties were mistaken to believe this issue requires the Court's attention. The parties' actual dispute concerns whether the plaintiffs have provided information and documentation necessary to establish that they are entitled to further advance payments. *See* Defs.' Resp. at 7–8. This question must be presented to the jury.

### III.  CONCLUSION

For the foregoing reasons, the defendants' motion for judgment on the pleadings, ECF No. 23, is denied. Further, to the extent that the parties have identified certain insurance policy provisions as being at issue, *see* Joint Statement, ECF No. 25, those provisions are interpreted in

15

the plaintiffs' favor, but the factual questions raised by the defendants must be presented to the jury.

An appropriate Order accompanies this Memorandum Opinion.

DATE: February 7, 2020

_____
BERYL A. HOWELL
Chief Judge